440 F.2d 255
 142 U.S.App.D.C. 227
 P.A.M. NEWS CORPORATION, L.F.M. News, Inc., Appellants,
v.
Clifford M. HARDIN, Individually and in his capacity as
Secretary of Agriculture, United States Department
of Agriculture, American Telephone and
Telegraph Company.
 No. 23015.
 United States Court of Appeals, District of Columbia Circuit.
 Decided Feb. 9, 1971, Petition for Rehearing Denied March 15, 1971.
 
 Messrs. Raymond G. Larroca and Nathan Lewin, Washington, D.C., were on the brief for appellants.
 Messrs. Thomas A. Flannery, U.S. Atty., and Alan S. Rosenthal and Stephen R. Felson, Attys., Department of Justice, were on the brief for appellees Hardin and the Department of Agriculture.
 Messrs. Hugh B. Cox and Paul F. McArdle, Washington, D.C., were on the brief for appellee American Telephone and Telegraph Company.
 Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit judges.
 BAZELON, Chief Judge:
 
 
 1
 This is an appeal from the dismissal of the complaint of two private news wire services which sought to enjoin the Secretary of Agriculture, the United States Department of Agriculture (the USDA), and the American Telephone and Telegraph Company (AT&T) from operating a government news wire service in competition with the appellants.
 
 
 2
 P.A.M. News Corporation collects agricultural data from the USDA as well as from its own staff of reporters, wire services, the staff of domestic and overseas bureaus, and correspondents of affiliated organizations. The information is collated, analyzed, edited, and assembled into P.A.M.'s own format and transmitted to its customers on a broad page teletypewriter sheet over facilities leased from Western Union Telegraph Company. This news, dealing with prices, market conditions, weather reports, business news of national import and general news items, is received by growers, shippers, receivers, and marketers of agriculture products related to the fresh fruit and vegetables industry.
 
 
 3
 L.F.M. News, like P.A.M., collects its data from the USDA, its own reporters, news services, and correspondents. After collation, analysisEditing and assembly, its news content-- dealing with products and market conditions relating to the livestock, feed and meat industries, together with weather reports, business news and general news items-- is transmitted over a teletypewriter circuit leased from AT&T to interested packers, brokers, and growers.
 
 
 4
 The USDA Market News Service, the extension of which is challenged in this case, is generally based on the activities of USDA reporters who cover the permanent and seasonal markets and producing areas. The information secured locally is assembled and analyzed by USDA reporters, integrated with other information received from reporters at other points, and released for local use. Some of it is also relayed to central Market News Offices for further analysis and integration into reports covering information for broad regions, or in some cases the entire country. The USDA begain using wire circuits to connect various USDA offices throughout the country in 1917. At the times relevant to this case, the market news was transmitted between the Washington, D.C., office and approximately 170 USDA branch offices throughout the United States over a wire network leased from AT&T.
 
 
 5
 At various times, the news collected by USDA has been distributed in many ways by the USDA Market News Service Offices. These include daily mimeograph reports; summaries to local papers, broadcast stations, and news wire services; answers to telephone calls or telegrams; and posting of reports at stockyards, public markets, and the market news offices themselves.
 
 
 6
 Moreover, at various times certain users of the USDA market news have made arrangements with the USDA whereby some of the information on the USDA Market News Service leased wire network (th 'spine' network) would be indirectly relayed to them after the information had cleared the spine network. This was done by arrangements with the USDA under which the users, at their own expense, would take the tape off the USDA receiving machines hooked up to the USDA spine network and put it onto transmitting machines that disseminated this information over other teletypewriter circuits leased and paid for by these users. One such user was the predecessor of P.A.M.-- Trans Lux Produce News Corporation-- which leased its own line between Washington, D.C., and its headquarters in New York so that the USDA information could be relayed to New York for use in the preparation of the Trans Lux Market News Service. Trans Lux, and later P.A.M., paid the carrier for the leased line and the equipment, and also paid a wordage charge to the USDA for this service.
 
 
 7
 Prior to August 1, 1963, the USDA had never permitted any information carried over the spine network to be received directly off that network by anyone by means of a direct extension connecuion to that network. Since that date, however, the situation has changed. Information transmitted in bulk over the USDA spine network is now also transmitted directly to the ultimate recipient, bypassing the private news media. By agreement with AT&T the USDA has permitted customers to 'tap' directly off the spine network and receive messages circulated over that network. Moreover, the cost to the customer of having such an extension 'drop' is merely the cost of the transmission facilities between the customer's premises and the point on the spine circuit nearest those premises, plus a 'station charge' for the receiving equipment. The 'drop' customer makes no payment to the USDA or AT&T for the collecting or editing of the news or for transmitting it to the point on the spine network nearest his premises.
 
 
 8
 Appellants sued to enjoin the new direct extension service. They alleged, inter alia, that this direct government competition-- which threatens to drive them out of business-- infringes their First Amendment rights. In dismissing the complaint, the District Court held, first, that appellants, 'alleging mere competitive injury, lack standing to complain of the operation of the direct extension service.' Next, it held that 'the direct extension service of the Department of Agriculture has not resulted in the abridgement of any of (appellants') rights under the First Amendment.' Appellants attack both of these holdings on this appeal. Standing
 
 
 9
 Recent cases of this court and the Supreme Court have thoroughly canvassed the question of standing, and we see no need to linger over it here.[1] Appellants clearly had standing to raise the constitutional issue that appears in their complaint. First, they alleged 'injury in fact.' Second, the interest appellants seek to protect is 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'[2] Appellant's legal position may not be correct, but it is not frivolous. Appellants are entitled to present their legal theory in court, and it is clearly incorrect to deny them that opportunity by prejudging the substantive issue.[3] Finally, it is not claimed that there is any manifestation of legislative intent to withhold judicial review from this kind of case. All the requirements of standing, therefore, were fulfilled in this case.
 
 The Merits
 
 10
 Although appellants had standing to raise their First Amendment claim, we think that it was not ripe for decision. Courts generally prefer to rule upon constitutional questions which involve the scope of power of an administrative agency only after the agency itself has considered the constitutional issue and made a determination about the weights of competing administrative policies and interests. The record in this case fails notably in this respect. From what we have before us, we cannot say that the Department of Agriculture complied with the requirements of Section 4 of the Administrative Procedure Act: absolutely no statement of the basis for its action seems to have been made, as required by that section.[4]
 
 
 11
 The question of compliance with this part of Section 4 was not ruled upon by the District Court. Appellants share the blame for this omission since the chief procedural objection in the complaint was that the notice requirement of Section 4 had not been met by the Department of Agriculture.[5] But appellants' failure squarely to present the question below cannot be said to preclude this court from remanding on that ground when, as in these circumstances, resolution of the constitutional question must involve a weighing of competing administrative policies which would be inappropriate without a statement from the administrative agency most closely involved.[6]
 
 
 12
 Therefore, we reverse the District Court's determination that no violation of First Amendment rights occurred; we remand the case to the District Court with instructions that it consider whether the Department of Agriculture complied with Section 4 of the Administrative Procedure Act. If it did not, the agency must be directed to comply with that section, and the District Court will have to consider what interim relief is appropriate under the circumstances of the case.[7]
 
 
 13
 Remanded for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970); Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970)
 
 
 [2]
 Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. at 153, 90 S.Ct. at 830
 
 
 [3]
 'The 'legal interest' test goes to the merits. The question of standing is different.' Id. Thus, though the appellants allege 'mere competitive injury,' the bone of their contertion on the merits is that the First Amendment protects news media, in certain circumstances, from injury caused by direct governmental competition
 
 
 [4]
 It is clear, in the first place, that the institution of the direct extension service by the Department of Agriculture constituted the adoption of a 'rule' within the meaning of that word as defined in Section 2 of the Administrative Procedure Act, 5 U.S.C. 551(4): "rule' * * * includes the approval or prescription for the future of * * * services * * *.'
 Second, the rule-making requirements of Section 4 of the Act, 5 U.S.C. 553, include the following:
 '(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.'
 On May 17, 1963, the USDA issued a notice which announced that the Department was considering a direct extension service and called for written comments by June 15, 1963, That notice appeared in the Federal Register on May 25th By that time P.A.M.'s president had already telegraphed the Department concerning his objections to the new service. His request for additional time to comment was refused. Later in August 1963 representatives of P.A.M. met with officials of the Department and presented their objections. In November, the complaint instituting the present action was filed.
 On the matter of official announcement of decision, all that appears from the record in this case is that on July 10, 1963, the Department announced the institution of the new service and described it in what may most accurately be described as an advertising brochure. Administrative agencies must give reasoned consideration to all the material facts and issues presented to them in the rule-making proceeding and must articulate with reasonable clarity their reasons for decision. See Greater Boston Television Corp. v. F.C.C., No. 17,785 (D.C.Cir. Nov. 13, 1970), slip op. at 17. There is not the slightest doubt that such announcements as appear from the record to have been made in this case do not amount to the 'concise general statement' of reasons which is required.
 
 
 [5]
 The District Court made findings adverse to appellants on this issue, and they do not pursue the matter on appeal. See note 4 supra. Appellants also complained that the Department of Agriculture had not sufficiently consulted and cooperated with state agricultural departments, as it is required to by the Agricultural Marketing Act of 1946, 7 U.S.C. 1621. The District Court did not specifically rule on this issue. Since we are remanding this case for different reasons, appellants, will have an opportunity to argue this claim more fully to the District Court
 
 
 [6]
 The Agricultural Marketing Act of 1946 authorizes the Secretary of Agriculture to
 'collect and disseminate marketing information, including adequate outlook information on a market-area basis, for the purpose of anticipating and meeting consumer requirements, aiding in the maintenance of farm income, and bringing about a balance between production and utilization of agricultural products.'
 7 U.S.C. 1622(g). Dissemination of agricultural information has long been an important function of national government in this country. However, the same Act states:
 'The Congress declares that a sound, efficient, and privately operated system for distributing and marketing agricultural products is essential to a prosperous agriculture and is indispensable to the maintenance of full employment and to the welfare, prosperity, and health of the Nation.' 7 U.S.C. 1621. In addition, 31 U.S.C. 483a provides:
 'It is the sense of the Congress, that any work, service, publication, report, document, benefit, * * * or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency * * * to or for any person * * *, except those engaged in the transaction of official business of the Government, shall be self-sustaining to the full extent possible. * * *'
 The competing implications of these provisions are immediately apparent in the context of this case, where customers of the USDA news service are charged significantly less than customers of the private news services, since none of the costs of the USDA service itself are charged to the USDA customers.
 Appellants quite correctly point out that the presence of a possible constitutional problem is reason to consider carefully whether the administrative action objected to is authorized under the applicable statutes. Any judicial review of administrative action-- whether the question is the constitutionality of the relevant action or the statutory authorization-- is more intelligently undertaken when it is informed by the agency's own view of its authorized powers.
 
 
 [7]
 The role of AT&T in supplying the USDA Market News Service was a major issue at the trial below, and the trial judge made detailed findings of fact and conclusions of law on that role when the complaint was dismissed. These findings and conclusions were not seriously challenged on this appeal. The dismissal of the complaint, therefore, is affirmed so far as it affects AT&T, and AT&T need no longer be a party to this action