CENTER FOR AUTO SAFETY,
Petitioner,

v.

NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,
Respondent.

No. 81–2245.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 18, 1982.

Decided June 21, 1983.

---

Barbara L. Bezdek, Washington, D.C., with whom Clarence M. Ditlow, Washington, D.C., was on the brief, for petitioner.

Enid Rubenstein, Atty. Nat. Highway Traffic Safety Admin., Washington, D.C., (NHTSA), with whom Frank Berndt, Gen. Counsel, and David W. Allen, Asst. Chief Counsel, Nat. Highway Traffic Safety Admin., Washington, D.C., (NHTSA), were on the brief, for respondent.

Before: MIKVA, Circuit Judge, MacKINNON, Senior Circuit Judge, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion PER CURIAM.

Separate opinion filed by Senior Circuit Judge MacKINNON, concurring in the judgment.

PER CURIAM:

This case involves the federal program that imposes fuel efficiency requirements, measured in terms of average miles-per-gallon (mpg), on automobiles and light trucks for model years beginning in 1978. The Center for Auto Safety (CAS) petitions for review of action by the National Highway Transportation Safety Administration (NHTSA) that withdrew an advance notice of proposed rulemaking. That notice, first issued in January 1981 but withdrawn three

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

months later, requested public comment on possible improvements in these fuel efficiency standards. Although we conclude that this court has subject matter jurisdiction to review the NHTSA action at issue, we also conclude that the controversy is not yet ripe for judicial review. We therefore dismiss the petition.

## I. BACKGROUND

As a reaction to the energy shortage and resulting economic downturn that followed the oil embargo of 1973–1974, Congress enacted the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 871 (1975). In general terms, the statute was designed "to increase domestic energy supplies and availability; to restrain energy demand; [and] to prepare for energy emergencies." S.Rep. No. 516, 94th Cong., 1st Sess. 116, reprinted in 1975 U.S.CODE CONG. & AD. NEWS 1762, 1956, 1956. Title III of that statute, known separately as Title V of the Motor Vehicle Information and Cost Savings Act (MVICSA), Pub.L. No. 94–163, § 301, 89 Stat. 871, 901–16 (codified at 15 U.S.C. §§ 2001–2012 (1976 & Supp. V 1981)), established mandatory fuel standards for new passenger automobiles and light trucks beginning with model year 1978. The statute set specific numerical standards for affected vehicles manufactured in model years 1978–1980 and required the Secretary of Transportation or his designee NHTSA to set such standards for the model years from 1981 through 1984. 15 U.S.C. § 2002(a)(1) (1976). Pursuant to this statutory directive, the average fuel economy standard was legislatively set for the years 1978 through 1980 at 18.0 mpg, 19.0 mpg, and 20.0 mpg, respectively, see id., and administratively set for the years 1981 through 1984 at 22.0 mpg, 24.0 mpg, 26.0 mpg, and 27.0 mpg, respectively, see 42 Fed.Reg. 33,534 (1977). All of these recent administrative standards were properly set by the agency and are not being challenged in this case.

For model years 1985 and beyond, however, the MVICSA specifically designates 27.5 mpg as the average fuel economy for the affected vehicles. 15 U.S.C. § 2002(a)(1) (1976). At the same time, subject to congressional approval, the agency "may, by rule, amend the average fuel economy standard ... for model year 1985, or for any subsequent model year, to a level which [it] determines is the maximum feasible average fuel economy level for such model year," id. § 2002(a)(4). Thus, beginning with model year 1985, the required average fuel efficiency will be 27.5 mpg unless NHTSA decides to modify that standard.

To facilitate the exercise of its discretion for model years 1985 and beyond, NHTSA promulgated an advance notice of proposed rulemaking on January 19, 1981. See 46 Fed.Reg. 8,056 (1981) (hereinafter January Notice). That notice sought public comment from interested parties on the improvements that might be made in future fuel economy standards. The notice carefully stated that its issuance was not intended to indicate that stricter standards necessarily would be established, but rather that its purpose was to gather pertinent information. Specifically, the agency solicited comments relating to available technologies, economics, emission and safety requirements, energy considerations, public choices for the agency, and legislative initiatives for the Congress. These comments were due by April 27, 1981.

On April 6, 1981, however, the White House issued a presidential directive that announced the administration's intention to withdraw this advance notice of proposed rulemaking. See Office of the Press Secretary, Actions to Help the U.S. Auto Industry A–35, reprinted in Joint Appendix (JA) 198 ("Because strong market demand for fuel-efficient vehicles is expected to continue, NHTSA believes the initiation of rulemaking on post-1985 fuel economy standards to be unnecessary."). Soon thereafter, NHTSA officially announced withdrawal of the January Notice, see 46 Fed.Reg. 22,243 (1981), essentially relying on three factors to justify the change in policy: (1) that market forces were creating strong consumer demand for fuel efficient cars;

(2) that manufacturers were responding to those demands and were planning products that would meet fuel efficiency needs; and (3) that any information gathered during April 1981 would prove useless because it would not be current when eventually needed. Finally, NHTSA concluded that, "given the present situation, it is unlikely that the agency will need to commence rulemaking in the foreseeable future." *Id.*

CAS promptly petitioned for reconsideration of NHTSA's decision, asserting that withdrawal of the January Notice was "not supported by the reasons cited, . . . unreasonable in light of the expressed purposes and commands of the [statute], and . . . not in the public interest." Letter from Barbara L. Bezdek, Staff Attorney, CAS to Raymond Peck, Administrator, NHTSA (May 16, 1981), *reprinted in* JA 56–58. The CAS petition argued that relying purely on market forces was contrary to the congressional determination that mandatory standards were needed and that, even if market pressures are effective in this area, the statute requires that the agency consider four factors—technological feasibility, economic practicability, the effect of other motor vehicle standards, and the need of the nation to conserve energy—when determining the maximum feasible average fuel economy to be established, *see* 15 U.S.C. § 2002(e) (1976).

This petition for reconsideration was denied, both in a lengthy letter to CAS, Letter from Michael M. Finkelstein, Associate Administrator for Rulemaking, NHTSA to Barbara L. Bezdek, Staff Attorney, CAS (Sept. 25, 1981), *reprinted in* JA 59–62, and in a shorter, yet formal announcement in the *Federal Register, see* 46 Fed.Reg. 48,383 (1981). In these documents, NHTSA reiterated that market forces were stimulating manufacturers to develop fuel efficient vehicles; indeed, evidence suggested that plans announced by the manufacturers would far exceed the standards already in existence. The agency also contested any claim that it was acting contrary to the statute or the public interest, asserting summarily that "the industry's ongoing program of new investment . . . will result in

meeting consumer demands and fulfilling the Nation's energy conservation goals in this sector" and that "[a]s long as the demands of the marketplace are being met and these demands fulfill the Nation's energy conservation goals, the public interest is being served." Letter from Michael M. Finkelstein at 3–4.

CAS then filed its timely petition for review with this court. A preliminary motion to dismiss was filed by the agency, premised alternatively on this court's lack of subject matter jurisdiction and on a claim that the petition for review was not yet ripe. By order of this court, that motion was referred to this panel for full briefing and argument together with the merits of CAS' petition.

## II. Subject Matter Jurisdiction

■ This court, like all courts of appeals, is not a court of general jurisdiction and "[s]uch jurisdiction as it has, to review directly the action of administrative agencies, is specially conferred by legislation relating specifically to the determinations of such agencies made subject to review . . . ." *American Federation of Labor v. NLRB,* 308 U.S. 401, 404, 60 S.Ct. 300, 302, 84 L.Ed. 347 (1940); *cf. Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (the Administrative Procedure Act does not provide an independent basis for jurisdiction in the courts of appeals). CAS, therefore, necessarily relies on the judicial review provision of the Motor Vehicle Information and Cost Savings Act to support its claim that this court has jurisdiction to review NHTSA's decision to withdraw the advance notice of proposed rulemaking. That section of the statute provides in relevant part:

Any person who may be adversely affected by *any rule* prescribed under section 2001, 2002, 2003, or 2006 of this title may, at any time prior to 60 days after such rule is prescribed . . . file a petition in the United States Court of Appeals for the District of Columbia . . . for judicial review of such rule. . . .

15 U.S.C. § 2004(a) (1976) (emphasis added). NHTSA argues that in issuing and subsequently withdrawing the advance notice of proposed rulemaking, it neither proposed nor established a rule subject to the jurisdiction of this court under this statute. We cannot agree with that construction.

Although section 2004(a) does not itself define "rule," it does indicate that review of agency decisions by the various courts of appeals is to proceed in accordance with the judicial review provisions of the Administrative Procedure Act (APA). *See* 15 U.S.C. § 2004(a) (1976) ("the court shall have jurisdiction to review the rule in accordance with chapter 7 of Title 5 [i.e., the APA] and to grant appropriate relief as provided in such chapter"). The APA, 5 U.S.C. § 701(b)(2) (1976), in turn, provides that "rule" is to have the meaning given in 5 U.S.C. § 551(4) (1976):

> "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy....

We previously have observed that this definition is broad enough "to include nearly every statement an agency may make ...." *Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980) (selection by the Department of Labor of a statistical methodology for analyzing unemployment data is a rule within APA definition); *see also Guardian Federal Savings & Loan Association v. FSLIC,* 589 F.2d 658, 662, 666 (D.C.Cir. 1978); *P.A.M. News Corp. v. Hardin,* 440 F.2d 255, 258 n. 4 (D.C.Cir.1971). The mere fact that NHTSA did not denominate its withdrawal of the January Notice a "rule" is not determinative of whether it did, in fact, issue a rule within the meaning of the statute. "[I]t is the substance of what the [agency] has purported to do and has done which is decisive." *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942); *accord Chamber of Commerce of United States v. OSHA,* 636 F.2d 464, 467–68 n. 4 (D.C.Cir.1980); *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 124 (D.C. Cir.1975) (en banc).

In withdrawing the January Notice, NHTSA interpreted section 2002(a)(4) as giving it broad discretion to determine whether to modify the fuel economy standards at issue in this case. It also established a policy not to exercise that discretion if market forces were causing automobile manufacturers voluntarily to improve the fuel economy of their products. Furthermore, in denying CAS' petition for reconsideration, the agency informally concluded that the automobile manufacturers' plans for voluntarily improving fuel economy were sufficient to meet the nation's energy conservation goals. These statements accompanying the withdrawal of the January Notice clearly interpret the relevant statute and indicate NHTSA's policy regarding the exercise of discretion granted to it by that legislative enactment. Given our prior decisions construing the Administrative Procedure Act's broad definition of "rule," we are compelled to conclude that NHTSA has prescribed a rule sufficient to grant this court jurisdiction under 15 U.S.C. § 2004(a) (1976).

## III. RIPENESS

■ Having determined that NHTSA's withdrawal of the January Notice and its accompanying justifications constitute a "rule" subject to review in this court, we turn to the question whether the agency action is ripe for judicial review. Although the issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced, an agency decision to terminate its rulemaking proceedings usually is ripe for review as final agency action. *See, e.g., Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216 (D.C. Cir.1983); *WWHT, Inc. v. FCC,* 656 F.2d 807 (D.C.Cir.1981); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031 (D.C.Cir.1979). This is especially true when, as in the present case, the agency explicitly indicates that its decision to ter-

minate rulemaking is intended as a means of choosing the status quo over other reasonable alternatives. *See* 46 Fed.Reg. 22,-243 (1981) ("it is unlikely that the agency will need to commence rulemaking in the foreseeable future"). Thus, to the extent that NHTSA's public statements withdrawing its January Notice represent a binding decision not to adopt or enforce improved fuel efficiency standards for particular years in the future, but rather represent a decision to maintain the 27.5 mpg standard provided for by Congress, they logically should be ripe for review.

But finality for purposes of judicial review of agency action is to be construed in a "pragmatic way." *FTC v. Standard Oil Co.,* 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967)). NHTSA therefore argues that, because it has left open the possibility that the agency will initiate new rulemaking proceedings at some point in the future, *see, e.g.,* 46 Fed. Reg. at 22,243 ("[t]he agency will continue to monitor the effects of the market and the efforts of the manufacturers to improve automobile fuel efficiency"); *id.* at 48,383, its decision to withdraw the January Notice is nonfinal as to the years covered by the terminated rulemaking. We would, indeed, be hard-pressed to conclude that the agency's decision to terminate rulemaking for 1995, the last year covered by the January Notice, is ripe for immediate judicial review. Thus, it is necessary to determine for which years covered by the January Notice, if any, NHTSA's decision to terminate its rulemaking is a final, binding decision—that is, a final decision to leave untouched the statutorily established alternative fuel standard of 27.5 mpg, *see* 15 U.S.C. § 2002(a)(1) (1976).

We begin by noting that Congress itself has imposed several timing requirements on any change in fuel efficiency standards. First, section 2002(f)(2) of the MVICSA requires that any amendment to the mandatory fuel standards that makes those standards more stringent must be promulgated at least eighteen months prior to the beginning of the affected model year. 15 U.S.C. § 2002(f)(2) (1976). Thus, amendments to standards for the 1985 model year—which we presume absent contrary evidence to begin during the autumn of 1984—must be promulgated by early 1983; amendments to standards for the 1986 model year must be promulgated by early 1984; and so on. Second, section 2002(h) requires that these amendments be issued pursuant to the informal rulemaking procedures contained in 5 U.S.C. § 553 (1976), a process that likely will take at least a few months to complete. Thus, the statute has built into its structure a minimum lead time of at least twenty months. By itself, that would make a decision not to amend the 27.5 mpg standard for 1985 model year vehicles a final agency action currently ripe for review. *But see infra* p. 848.

As for later model years, the record is very much inconclusive. Although CAS argues that several years of lead time are required before automobile manufacturers could meet more stringent fuel efficiency standards, *cf.* 15 U.S.C. § 2002(a)(3) (1976) (requiring NHTSA to issue standards for model years 1981–1984 by July 1, 1977), the statute requires only the eighteen-month period set in section 2002(f)(2) plus time for informal rulemaking under section 2002(h). Moreover, NHTSA has far from conceded any lengthy lead time requirements; indeed, to the extent that manufacturers are already planning to exceed standards currently in existence, and have the technology available to do so, no appreciable lead time beyond that established by the statute would be necessary. Thus, given the limited timing requirements imposed by the statute and no conclusive evidence that longer lead times will be necessary, NHTSA's decision to withdraw its January Notice and terminate rulemaking for model year 1986 is neither final agency action nor ripe for judicial review until early in the 1984 calendar year. It necessarily follows that NHTSA's decision is not yet ripe as it relates to subsequent model years. CAS'

petition for review, therefore, must be dismissed for model years 1986 and beyond.

As noted above, the agency decision to withdraw the January Notice and thereby maintain 27.5 mpg as the fuel standard for model year 1985 would be ripe for review if such a decision was being challenged. But it is far from certain whether that situation exists in the present case. Each of the documents crucial to the NHTSA action being reviewed vacillate in their description of the exact model years affected by the agency's decision. For example, the advance notice of proposed rulemaking uses the terms "1985–1995 period" and "post-1985 period" interchangeably. *Compare* 46 Fed.Reg. at 8,056 *with id.* at 8,057, 8,061. NHTSA is similarly inconsistent between its statement withdrawing the January Notice, *see* 46 Fed.Reg. at 22,243 ("1985–1995 period"), and its statement denying CAS' petition for reconsideration, *see* 46 Fed.Reg. at 48,383 ("post-1985"). Finally, CAS itself demonstrates this inconsistency in its letter petitioning the agency for reconsideration. *Compare* JA 56 ("after 1985" and "post-1985") *with* JA 58 ("in 1985 and later model years").

Confronted with this uncertainty, if not outright confusion, about the model years affected by the NHTSA actions, the court addressed some specific inquiries to counsel for CAS at oral argument:

> Counsel: NHTSA itself initiated a proceeding by issuing an advance notice of proposed rulemaking and invited public input on what would be feasible fuel economy levels to be achieved in the period after 1985.
>
> Court: After when?
>
> Counsel: 1985–1995.
>
> Court: ... Did you say *after* 1985?
>
> Counsel: Yes, your honor.
>
> Court: Because the records and the briefs wander around on whether if was *for* 1985 or *after* 1985.
>
> Counsel: The statutory delegation indicates that the agency has authority to amend the standards for 1985 or the years thereafter.

> Court: *But the advance notice did not contemplate doing anything for '85.*
>
> Counsel: *Yes, your honor.*

Oral Argument, Nov. 18, 1982 (emphasis added). Given the uncertainty in the record and briefs presented to the court, this concession that standards for model year 1985 are not being challenged proves telling. Indeed, a challenge by CAS to "post-1985" standards, but not to standards for the 1985 model year, makes perfect sense. The 27.5 mpg standard now set for model year 1985 is already an increase over the 27.0 mpg standard in effect for model year 1984. And CAS has consistently sought a continuously increasing level of fuel efficiency for the affected motor vehicles—a position that is entirely consistent with its concession at oral argument. Thus, the agency action being challenged, though admittedly unclear, focused on model years after 1985—i.e., exactly those years about which this petition for review is not yet ripe. Given this conclusion, the petition is properly dismissed until such time as judicial review of NHTSA's decision is more appropriate.

■ The "basic rationale" behind the ripeness doctrine is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In the present case, NHTSA has made only a preliminary decision not to amend the fuel efficiency standard now in existence for vehicles beginning with model year 1986. Until the beginning of the 1984 calendar year, when the agency's decision effectively will become final for model year 1986 vehicles, the agency has a chance, either on its own initiative or in response to another petition for reconsideration, to amend the 27.5 mpg standard or to give better reasons for its

decision not to do so.* Thus, the agency decision is not yet ripe for review and the petition for review must be dismissed.

*It is so ordered.*

MacKINNON, Senior Circuit Judge, concurring in the judgment:

The Center for Auto Safety (Center) petitions to review the withdrawal by the National Highway Traffic Safety Administration (Highway Administration) of an advance notice of proposed rulemaking which sought public comment on possible improvements in the fuel economy of automobiles and light trucks in the 1985–1995 period. The advance notice stated that its issuance did not necessarily indicate that fuel economy standards would be established and that its purpose was to gather pertinent information to determine whether standards should be set and, if so, at what level. Within three months of its issuance, the Highway Administration withdrew the advance notice because it believed that market forces made it unnecessary to initiate rulemaking on post-1984 fuel economy standards and, therefore, that the public comments which would be received could not be put to significant use. The Center petitioned the Highway Administration to reconsider its withdrawal of the advance notice, contending that withdrawal was not

supported by the reasons given, was unreasonable in view of the requirements of the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 871 (1975), and was not in the public interest. I conclude that the agency's decision to withdraw the advance notice constituted "agency action ... committed to agency discretion by law," excepted from judicial review by the Administrative Procedure Act, 5 U.S.C. § 701(a)(2) (1976). I therefore agree that the petition for review must be dismissed.

I.

In response to dislocations in the nation's economy caused by the OPEC oil embargo of 1973–1974, Congress enacted the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 871 (1975) (Conservation Act), for the purposes "of increasing domestic supply, conserving and managing energy demand, and establishing standby programs for minimizing this nation's vulnerability to major interruptions in the supply of petroleum imports." H.R.Rep. No. 94–340, 94th Cong., 1st Sess. 1 (1975), U.S.Code Cong. & Admin.News 1975, 1762, 1763. Recognizing that the automobile represented the largest single user of petroleum in the United States,[1] the Conservation Act created a program of mandatory fuel economy standards for automobiles and light trucks.[2] Energy

---

* Without conclusively deciding the issue, we must register our doubts concerning the analysis contained in the concurring opinion, which concludes that NHTSA's withdrawal of its advance notice of proposed rulemaking is "committed to agency discretion by law." Such a conclusion fails to realize that, when the agency decision in this case becomes ripe for review, it is because the agency refusal to act effectively maintains 27.5 mpg as the applicable fuel standard for a particular year. *Cf.* 5 U.S.C. § 551(13) (1976) (defining "agency action" to include "the whole or a part of an agency rule ... or the denial thereof, or failure to act"). Under the statutory scheme established by Congress, such a final decision by NHTSA must determine the "maximum feasible average fuel economy level for such model year," 15 U.S.C. § 2002(a)(4) (1976), after considering specific factors also listed in the statute, *see id.* § 2002(e)(1)–(4). Thus, NHTSA's discretion is limited by relevant factors authoritatively established by the Congress. Judicial review to ensure that these factors properly are

considered by the agency is the most basic type of court review of administrative action. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). *See generally* Note, *Judicial Review of Administrative Inaction,* 83 Colum.L.Rev. 627 (1983).

1. S.Rep. No. 94–179, 94th Cong., 1st Sess. 2 (1975). Congress found that in 1972

   motor vehicles accounted for almost 20 percent of all energy consumed in the United States, and about 40 percent of all petroleum products consumed in the United States. H.R.Rep. No. 94–340, *supra,* at 86, U.S.Code Cong. & Admin.News 1975, at 1848.

2. Legislation providing for mandatory fuel economy standards for automobiles was first introduced in the Senate by Senator Hollings in 1973. S. 1903, 93d Cong., 1st Sess., 119 Cong. Rec. 17,230–33 (1973). An amended version of S. 1903 was incorporated into the Senate's omnibus energy conservation bill, the National Fu-

Policy and Conservation Act, Pub.L. No. 94–163, § 301, 89 Stat. 871, 901 (1975). Although the Act established, *inter alia*, mandatory fuel economy standards for passenger automobiles for model year 1985 and beyond, 15 U.S.C. § 2002(a)(1) (1976),[3] it also authorized the Highway Administra-

tion,[4] subject to congressional approval, to amend such standards to reflect the "maximum feasible average fuel economy level" for those model years. *Id.* § 2002(a)(4).[5]

On January 19, 1981, the Highway Administration issued an advance notice of

els and Energy Conservation Act of 1973, S. 2176, 93d Cong., 1st Sess. (1973). S.Rep. No. 93–526, 93d Cong., 1st Sess. 5–6 (1973). The legislation established a goal of "improving the industrywide fuel economy for new automobiles by at least 50% in 1984 in comparison to the 1974 model year." *Id.* at 51. The Secretary of Transportation was directed to establish "a single minimum fuel economy standard for the 1978 model year" and was permitted to establish such additional minimum fuel economy standards as necessary to achieve the congressionally mandated goal. *Id.* Although S. 2176 passed the Senate, 119 Cong.Rec. 40,446 (1973), it died in the House. S.Rep. No. 94–179, 94th Cong., 1st Sess. 18 (1975).

In the 94th Congress, a number of bills dealing with automobile fuel economy were introduced in the Senate. After hearings, the substance of these bills was consolidated into a single bill entitled the Automobile Fuel Economy and Research and Development Act of 1975, S. 1883, 94th Cong., 1st Sess. (1975). S.Rep. No. 94–179, 94th Cong., 1st Sess. 18 (1975). This legislation required the Secretary of Transportation to "establish standards for minimum average fuel economy for new automobiles and light duty trucks manufactured in model years 1977 through 1985." *Id.* at 20. The fuel economy standards were to be set at "maximum feasible levels" and were

to result in an industrywide average fuel economy level increase of 50 percent [to 21 miles per gallon] by model year 1980 over model year 1974 models [and] ... in an industrywide average fuel economy level which represents at least a 100-percent improvement (to 28 miles per gallon) by model year 1985 over the 1974 average.

*Id.* S. 1883 passed the Senate. 121 Cong.Rec. 22,879 (1975).

Similarly, automobile fuel economy legislation was considered by the House in the 94th Congress, first as a floor amendment to H.R. 6860, 94th Cong., 1st Sess. (1975)—which sought to encourage conservation of energy through tax incentives and disincentives—offered by Representative Sharp, 121 Cong.Rec. 18,695 (1975), and later as part of a comprehensive energy conservation bill, the Energy Conservation and Oil Policy Act of 1975, H.R. 7014, 94th Cong., 1st Sess. (1975). H.R.Rep. No. 94–340, *supra,* at 87–88. This legislation established average fuel economy standards for automobiles in several model years, including a standard of 20.5 miles per gallon for model year 1980 and a standard of 28.0 miles per gallon for model year 1985. The Secretary of

Transportation was required to establish fuel economy standards for model years 1981–1984, and was authorized to amend the 1985 standard, subject to congressional disapproval. *Id.* at 88–89. H.R. 7014 passed in the form of an amendment to S. 622, 94th Cong., 1st Sess. (1975), a bill passed by the Senate, 121 Cong. Rec. 9868 (1975), granting standby rationing and other authority to the President in the event of an embargo or other curtailment of petroleum supplies. 121 Cong.Rec. 29,852–53 (1975).

The Senate subsequently amended the House amendment to S. 622 to include, *inter alia*, the automobile fuel economy provisions of S. 1883. 121 Cong.Rec. 30,594, 30,617 (1975). The conference substitute for S. 622 included a compromise version of the fuel economy legislation which closely resembled that adopted by the House in H.R. 7014. *See* S.Rep. No. 94–516, 94th Cong., 1st Sess. 149–60 (1975) (comparison of fuel economy provisions of H.R. 7014, S. 1883, and conference substitute). The conference substitute, however, extended the 1985 model year fuel economy standard to subsequent model years. *Id.* at 154. The conference substitute was adopted as the Energy Policy and Conservation Act. 121 Cong.Rec. 40,739, 41,196 (1975).

3. The Conservation Act provides that the average fuel economy for passenger automobiles manufactured after model year 1984 shall not be less than 27.5 miles per gallon. 15 U.S.C. § 2002(a)(1) (1976).

4. The Conservation Act vests the Secretary of Transportation with the authority to enforce the mandatory fuel economy standards for automobiles. *See, e.g.,* 15 U.S.C. § 2008 (1976 & Supp. V 1981). The Secretary has delegated these responsibilities to the Highway Administration. 49 C.F.R. § 501.2(f) (1982).

5. 15 U.S.C. § 2002(a)(4) (1976) provides:

The Secretary may, by rule, amend the average fuel economy standard specified in paragraph (1) for model year 1985, or for any subsequent model year, to a level which he determines is the maximum feasible average fuel economy level for such model year, except that any amendment which has the effect of increasing an average fuel economy standard to a level in excess of 27.5 miles per gallon, or of decreasing any such standard to a level below 26.0 miles per gallon, shall be submitted to the Congress ... and shall not take effect if either House of the Congress disapproves such amendment....

proposed rulemaking (January Notice) which sought "public comment on the improvements that can be made in passenger automobile and light truck fuel economy in the 1985–1995 period." [6]  In April 1981, the President announced a "program to address directly the immediate problems of depressed sales, record losses, and severe unemployment" plaguing the automobile industry in the United States.  Office of the Press Secretary, Actions to Help the U.S. Auto Industry 1 (Apr. 6, 1981).  As part of this program, the Highway Administration indicated that the January Notice would be withdrawn because the agency believed "the initiation of rulemaking on post-1985 fuel economy standards to be unnecessary." Id. at A–35.  See Notice of Intent, 46 Fed. Reg. 21,203, 21,204 (1981).  The agency subsequently withdrew the January Notice, finding that strong consumer demand for fuel efficient vehicles had resulted in a firm commitment on the part of automobile manufacturers to improve the fuel economy of their products.  Accordingly, it concluded that

given the present situation, it is unlikely that the agency will need to commence rulemaking in the foreseeable future. Therefore, any information submitted in response to the [January Notice] would serve no immediate rulemaking purpose and would not be sufficiently current for use in the longer run.  Withdrawal of the notice will save the industry and public from having to make the effort to prepare information that cannot be put to significant use.[7]

The Center promptly petitioned the Highway Administration to reconsider its decision withdrawing the January Notice.  The Center asserted that withdrawal of the January Notice was "not supported by the reasons cited, [was] unreasonable in light of the expressed purposes and commands of the [Conservation] Act, and [was] not in the public interest." [8]  Disputing each of the Center's contentions, the Highway Administration denied the Center's petition for reconsideration.[9]  The Center then filed its petition for review with this Court.

The Highway Administration moved to dismiss the Center's petition for review,

6.  Advance Notice of Proposed Rulemaking, 46 Fed.Reg. 8056, 8056 (1981).  The January Notice did not propose any new fuel economy standards:

> The issuance of this notice does not necessarily indicate that standards will be established, but rather is intended as an information gathering process to determine whether standards should be set and, if so, at what level. . . .
> Id. at 8056–57 (emphasis added).

7.  Withdrawal of Advance Notice of Proposed Rulemaking, 46 Fed.Reg. 22,243, 22,243 (1981).

8.  Letter from the Center for Auto Safety to Raymond Peck, Administrator, National Highway Traffic Safety Administration 1 (May 16, 1981).  The Center argued that it was inappropriate for the Highway Administration to rely on consumer demand to spur voluntary efforts by automobile manufacturers to improve the fuel economy of their products.  The Center asserted that "[n]othing in the public record of the fuel economy program suggests that in the absence of performance standards, the industry's efforts to produce efficient vehicles will be any more energetic, effective, or competitive with foreign makers' after 1985, than they were

in the 1970's" when "[r]eliance upon market pressures and voluntary industry efforts [were] explicitly and vehemently rejected by Congress in establishing the fuel economy program, because of the industry's deplorable record. . . ," Id. at 2.

The Center also contended that the Highway Administration had not demonstrated that reliance on market forces for fuel economy improvements would result in achieving the congressional goal "that the 'maximum feasible' average fuel economy be attained" in the post-1984 period.  Id. at 3.  Accordingly, the Center concluded that by withdrawing the January Notice the agency had failed to meet its obligation under the Conservation Act of "securing the greatest fuel economy achievements possible."  Id.

9.  Letter from Michael M. Finkelstein, Associate Administrator for Rulemaking, National Highway Traffic Safety Administration, to the Center for Automobile Safety 1 (Sept. 25, 1981).  See Denial of Petition, 46 Fed.Reg. 48,383 (1981).  The Highway Administration reiterated that market forces were stimulating manufacturers to develop fuel efficient vehicles and that "the need for rulemaking to further improve fuel economy in the foreseeable future appears unlikely."  Letter from Michael Finkelstein, Associate Administrator for Rulemaking,

contending that the Court did not have jurisdiction to review its withdrawal of the January Notice and, alternatively, that the matter was not ripe for judicial review. Part II of our Per Curiam opinion, in which I join, holds that this Court has jurisdiction to review the Highway Administration's decision to withdraw the January Notice. Nevertheless, I conclude that the Conservation Act vests the Highway Administration with broad discretion to determine whether to amend the post-1984 fuel economy standards, and that the agency's exercise of

that discretion *in this case* is not subject to judicial review.[10] Accordingly, I join in dismissing the Center's petition for review.

## II.

### A.

Review of the Highway Administration's decision is governed by the Administrative Procedure Act,[11] which provides that an agency action is judicially reviewable, except to the extent that the "agency action is

---

National Highway Traffic Safety Administration, to the Center for Automobile Safety 2 (Sept. 25, 1981). The agency indicated that United States manufacturers had exceeded the fuel economy standards for model years 1980 and 1981, and cited evidence that the manufacturers planned to exceed the 1985 standards. *Id.* at 2–3.

The Highway Administration also disputed the Center's allegation that withdrawal of the January Notice was contrary to the Conservation Act and the public interest. The agency noted that its "[c]ontinued monitoring of the demands of the market and the efforts of manufacturers to improve fuel economy will enable [it] to determine the timing and extent of any further actions required under the statute." *Id.* at 3. Noting that the Conservation Act granted it *discretion* to review and amend the post-1984 fuel economy standards, the Highway Administration stated "that the industry's ongoing program of new investment to make its products more competitive and modernize its plants will result in meeting consumer demands and fulfilling the Nation's energy conservation goals in this sector." *Id.* The agency concluded that "[a]s long as the demands of the marketplace are being met and these demands fulfill the Nation's energy conservation goals, the public interest is being served." *Id.* at 4.

10. I find it necessary to decide whether the Highway Administration's decision to withdraw the January Notice is subject to judicial review because, in my view, the decision is ripe for review. The Per Curiam opinion concedes that

a decision not to amend the 27.5 mpg standard for 1985 model year vehicles [would be] a final agency action currently ripe for review.

Per Curiam Op., *supra*, at 847. Nevertheless, it concludes that the Highway Administration's decision is not yet ripe for review because the fuel economy standard for 1985 is not being challenged in this case. *Id.* at 846–849. I do not agree.

The agency action challenged in this case is the withdrawal of a notice entitled "Passenger Automobile and Light Truck Average Fuel Economy Standards; *Model Year 1985* and Beyond" which sought public comments "on the improvements that can be made in ... fuel economy in the *1985–1995 period.*" Advance Notice of Proposed Rulemaking, 46 Fed.Reg. 8056, 8056 (1981) (emphasis added). The Center's petition for reconsideration requested the Highway Administration to "complete the rulemaking prior to making so final a decision whether to issue standards for *1985* and later model years" and "to continue the rulemaking concerning fuel economy improvements in *1985* and later model years." Letter from the Center for Auto Safety to Raymond Peck, Administrator, National Highway Traffic Safety Administration 1, 3 (May 16, 1981) (emphasis added). That these two critical documents in the record clearly refer to the fuel economy standard for the 1985 model year demonstrates that the 1985 standard *is* at issue in this case. Therefore, since I agree that the time limits imposed by the Conservation Act require that an amendment to the 1985 standard be in place by early 1983 and that that time has passed, Per Curiam Op., *supra*, at 847–848, I conclude that the Highway Administration's decision to withdraw the January Notice is ripe for review.

11. 15 U.S.C. § 2004(a) (1976) provides:

Any person who may be adversely affected by any rule prescribed under section 2001, 2002, 2003, or 2006 of this title may, at any time prior to 60 days after such rule is prescribed ... file a petition in the United States Court of Appeals for the District of Columbia ... for judicial review of such rule.... [The clerk of that court] shall thereupon cause to be filed in such court the written submissions and other materials in the proceeding upon which such rule was based. Upon filing of such petition, the court shall have jurisdiction to review the rule in accordance with [the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1976)]....

committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (1976).[12] "This section creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Natural Resources Defense Council, Inc. v. SEC,* 196 U.S.App.D.C. 124, 136, 606 F.2d 1031, 1043 (1979). In determining whether judicial review of an agency action is appropriate, it is necessary to consider three factors:

> the need for judicial supervision to safeguard the interests of the plaintiffs; the impact of review on the effectiveness of the agency in carrying out its congressionally assigned role; and the appropriateness of the issues raised for judicial review.

*Id.* at 137, 606 F.2d at 1044.

This Court has previously considered the reviewability of an agency's exercise of discretion in the context of the agency's refusal to adopt a proposed rule. In *Natural Resources Defense Council, Inc. v. SEC, supra,* the Court considered whether an SEC decision not to promulgate a proposed environmental and equal employment disclosure rule after extensive rulemaking proceedings was properly reviewable. The Court concluded that in the context of an agency's decision *not* to adopt a rule the interests of the plaintiffs

> rarely present unusual or compelling circumstances calling for judicial review. In the present case, for example, the SEC has not invaded any of [their] substantive statutory or constitutional rights, nor singled them out for special and seemingly unfair treatment, nor even, indeed, taken any action to alter the *status quo ante.*

*Id.* at 138, 606 F.2d at 1045 (footnote omitted). Furthermore, the Court noted that judicial review necessarily interferes with an agency's effective performance of its statutory mission:

> Requiring an agency to defend in court its decision *not* to adopt proposed rules

will divert scarce institutional resources into an area that the agency in its expert judgment has already determined is not even worth the effort already expended. . . . *[T]he very prospect of litigation may cause the agency to give a proposal more elaborate consideration than it might actually merit.*

*Id.* (emphasis added).

Finally, the Court recognized that the strongest argument against reviewability was that the issues posed will often be inappropriate for judicial review.

> An agency's discretionary decision *not* to regulate a given activity is inevitably based, in large measure, on factors not inherently susceptable to judicial resolution—*e.g.,* internal management considerations as to budget and personnel; evaluations of its own competence; *weighing of competing policies within a broad statutory framework.* . . . [E]ven if an agency considers a particular problem worthy of regulation, *it may determine* for reasons lying within its special expertise *that the time for action has not yet arrived.* . . . The circumstances in the regulated industry may be evolving in a way that could vitiate the need for regulation. . . .

*Id.* at 139, 606 F.2d at 1046 (emphasis added). The Court concluded that when an agency does not adopt a rule, "the record and reasons statement will be of little use to a reviewing court unless they are *narrowly focused on the particular rule advocated by plaintiff or petitioner."* *Id.* (emphasis added).

Nevertheless, the *NRDC* Court found the SEC's decision not to adopt the rule at issue properly reviewable under the circumstances presented. The Court did not hold that agency decisions not to adopt rules were "reviewable *per se*" because "the relevant factors incline against reviewability. . . ." *Id.* at 140, 606 F.2d at 1047. Rather, the Court concluded that

---

**12.** Judicial review is also prohibited to the extent that "statutes preclude judicial review. . . ." 5 U.S.C. § 701(a)(1) (1976). There has been no suggestion by the parties that the

Conservation Act precludes review of the Highway Administration's decision to withdraw the January Notice.

discretionary decisions not to adopt rules are reviewable where, as here, *the agency has in fact held a rulemaking proceeding and compiled a record narrowly focused on the particular rules suggested* but not adopted.

*Id.* (footnote omitted) (emphasis added).

Subsequently, in *WWHT, Inc. v. FCC,* 211 U.S.App.D.C. 218, 656 F.2d 807 (1981), this Court held that an FCC order denying a rulemaking petition was properly reviewable under the principles enunciated in *NRDC.* The rulemaking petition suggested a proposed rule and the FCC received limited comments on that rule. *Id.* at 222–23, 656 F.2d at 811–12. Conceding that "the case for reviewability of the order ... [was] even less compelling than that in *NRDC,*" *id.* at 228, 656 F.2d at 817, the Court held that the order was reviewable because of the strong presumption in favor of judicial review. *Id.* at 226–27, 656 F.2d at 815–16.[13]

Thus in *NRDC* we concluded that the SEC's decision not to adopt a rule was a proper subject for judicial review because the agency had compiled an extensive record focused on that rule. Similarly, in *WWHT* we concluded that the FCC's denial

of a rulemaking petition was a proper subject for judicial review because the agency's decision was focused on the particular rule suggested by the petition.[14] In this case, however, the Highway Administration's decision was not focused on any particular fuel economy standard. Applying the principles established in *NRDC* and *WWHT,* I conclude that the agency's decision to withdraw the January Notice was an exercise of its discretion not subject to judicial review.

B.

Preliminarily, it is clear that the Conservation Act leaves the decision whether to amend the post-1984 fuel economy standards to the discretion of the Highway Administration. The Act provides that the Highway Administration *may* amend those standards, but provides no guidance as to how the agency is to determine whether such amendments are appropriate.[15] Furthermore, nothing in the legislative history of the Conservation Act limits the discretion of the Highway Administration in deciding if and when to amend the post-1984 fuel economy standards.[16] Thus the Highway Administration has broad discretion to amend the post-1984 fuel economy stan-

13. The Court tempered its decision by stating that

the decision to institute rulemaking is one that is largely committed to the discretion of the agency, and that the scope of review of such a determination must, of necessity, be very narrow.

*WWHT, Inc. v. FCC, supra,* 211 U.S.App.D.C. at 220, 656 F.2d at 809.

14. *See WWHT, Inc. v. FCC, supra,* 211 U.S. App.D.C. at 222–23, 656 F.2d at 811–12.

15. However, the Conservation Act *requires* that any fuel economy standard be set at the "maximum feasible average fuel economy level" *if* the Highway Administration exercises its discretion to amend that standard. 15 U.S.C. § 2002(a)(4) (1976). The Act further provides that

in determining maximum feasible average fuel economy, the Secretary shall consider—
(1) technological feasibility;
(2) economic practicability;
(3) the effect of other Federal motor vehicle standards on fuel economy; and
(4) the need of the Nation to conserve energy.

*Id.* § 2002(e).

My colleagues "fail to realize" the distinction between the discretion afforded by the Act to the Highway Administration in deciding whether to amend the fuel economy standards and the constraints imposed by the Act on the agency in amending the fuel economy standards if it exercises its discretion to do so. Per Curiam Op. at 849 n. *. The mere fact that the Conservation Act does not grant the Highway Administration unfettered discretion to amend the congressionally established post-1984 fuel economy standard does not limit, as my colleagues imply, the broad discretion to determine whether to amend that standard clearly granted to the agency by the Act.

16. In discussing section 2002(a)(4), the Conference Report on the Conservation Act stated:

The [Highway Administration] *is given authority* to adjust the "1985 and thereafter" standard ... to a level which he determines is the maximum feasible average fuel economy level for any such model year.

S.Rep. No. 94–516, 94th Cong., 1st Sess. 154 (1975), U.S.Code Cong. & Admin.News 1975, 1995 (emphasis added).

dards, subject only to congressional review. 15 U.S.C. § 2002(a)(4) (1976).[17]

Consideration of the Highway Administration's decision at issue in this case in light of the three factors relevant to the determination of reviewability set forth in NRDC,[18] indicates that its decision is not appropriate for judicial review. At the outset I note that the Center simply has not demonstrated any compelling need for judicial intervention to safeguard its interests. The Highway Administration's decision withdrawing the January Notice did not alter the congressional mandated post-1984 fuel economy standards. The only opportunity arguably foreclosed by the agency's decision was an opportunity for the Center to comment on potential fuel economy improvements in the 1985–1995 period.[19] Judicial intervention is not necessary to vindicate this interest for if, in fact, the Center has any meaningful contribution to make on the subject of automotive fuel economy, it may submit such information to the Highway Administration in the context of a petition for rulemaking seeking amendment of the post-1984 fuel economy standards.

Furthermore, judicial review of the Highway Administration's decision would likely impair the effectiveness of the agency. The January Notice sought *public comment* on possible improvement in automobile and light truck fuel economy in the 1985–1995 period. Since the Highway Administration has broad discretion to determine if and when to amend the post-1984 fuel economy standards, it necessarily must have even greater discretion to decide if and when it will seek public input to assist in its determination whether to consider such amendments. Judicial review of agency decisions regarding whether to seek public comment on their activities would magnify the importance of such decisions and would have the undesirable effect of making agencies reluctant to seek public participation unless

required to do so by statute or regulation. Such a result could only hamper the ability of agencies to perform their statutory duties.

Finally, the Highway Administration's decision to withdraw the January Notice is not well-suited for judicial review. Whereas in NRDC the agency developed an extensive record on the basis of rulemaking proceedings focused on a particular rule, and in WWHT the agency decision focused on a specific proposed rule, in this case the Highway Administration proposed no amendments to the post-1984 fuel economy standards in its January Notice. Nor did the Center propose any specific amendments to the post-1984 fuel economy standards in its petition for reconsideration of the Highway Administration's decision. As a result, the record of the Highway Administration's decision consists primarily of conclusory statements by the agency explaining why withdrawal of the January Notice was appropriate, and statements of a similar nature by the Center explaining why withdrawal was inappropriate.[20] Since the Highway Administration's decision did not focus on the merits of a particular amendment to the fuel economy standards, "judicial review [would] have an undesirably abstract and hypothetical quality." *Natural Resources Defense Council, Inc. v. SEC, supra,* 196 U.S.App.D.C. at 140, 606 F.2d at 1047. This Court found the case for reviewability less compelling in WWHT than in NRDC because the agency had not instituted rulemaking proceedings on the proposed rule, *WWHT, Inc. v. FCC, supra,* 211 U.S.App. D.C. at 228, 656 F.2d at 817. I find it even less so in this case where the record available for review is not focused on any proposed agency action.

## C.

The case for holding the Highway Administration's decision to withdraw the Jan-

17. *See* note 5 *supra.*

18. *Natural Resources Defense Council, Inc. v. SEC, supra,* 196 U.S.App.D.C. at 137, 606 F.2d at 1044. *See* discussion at p. 9 *supra.*

19. In its petition for review filed with this Court, the Center seeks only to reinstate the

January Notice. Petitioner's Brief at 16, 34 (June 1, 1982).

20. The record in this case provides the Court with little more than an additional brief from each of the parties. *See* notes 8 & 9 *supra.*

uary Notice reviewable is far weaker than the case for finding the agency's decision reviewable in either *NRDC* or *WWHT.* While the Center has failed to identify any significant interest which would be protected by our review of the agency's decision, it is clear that such review would discourage the Highway Administration from seeking public input into its decisionmaking process, thereby impairing its effectiveness. Furthermore, the record in this case is poorly suited for judicial review because it is not focused on any particular amendment to the fuel economy standards.

Our previous decisions recognize that the Administrative Procedure Act excepts certain actions committed to agency discretion from judicial review.[21] Cognizant of the strong presumption in favor of judicial review, I nevertheless hold that the Highway Administration's withdrawal of the January Notice, which sought public comment on possible fuel economy improvements in the 1985–1995 period, is such an action and is not subject to judicial review.

Accordingly, I join in dismissing the Center's petition for review.

---

**21.** *WWHT, Inc. v. FCC, supra,* 211 U.S.App. D.C. at 225–26, 656 F.2d at 814–15; *Natural Resources Defense Council, Inc. v. SEC, supra,* 196 U.S.App.D.C. at 136–40, 606 F.2d at 1043–

47.[1] *See* 5 U.S.C. § 701(a)(2) (1976). Of course, both *NRDC* and *WWHT* concluded that the agency action at issue was, in fact, reviewable.