**CENTER FOR AUTO SAFETY and John Hubbard, Petitioners,**

v.

**Joan CLAYBROOK, Administrator National Highway Traffic Safety Administration, Respondent,**

**Officine Alfieri Maserati, S.P.A., Intervenor.**

**No. 79–1292.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1980.

Decided April 7, 1980.

Barbara L. Bezdek with whom Clarence M. Ditlow, III, Washington, D.C., was on brief, for petitioners. Katherine A. Meyer, Washington, D.C., also entered an appearance, for petitioners.

David W. Allen, Asst. Chief Counsel, National Highway Traffic Safety Administration, Washington, D.C., with whom Enid Rubenstein and Stephen R. Kratzke, Attys., National Highway Traffic Safety Administration, Washington, D.C., were on brief, for respondent.

Jay W. Seeman, New York City, was on brief, for intervenor.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and ROBINSON, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

Concurring opinion filed by Chief Judge J. SKELLY WRIGHT.

BAZELON, Senior Circuit Judge:

Petitioners, a non-profit corporation and an individual,[1] challenge exemptions from federal fuel economy standards issued by the National Highway Traffic Safety Administration (NHTSA). The three exemptions at issue all cover low-volume luxury car manufacturers—Rolls-Royce Motors, Ltd., Excalibur Automobile Corp., and Officine Alfieri Maserati ("Maserati"). Only Maserati intervenes here in support of the agency's position. Because we find no abuse of discretion by NHTSA, we deny the petition for review.

## I.

The automotive fuel economy program was established by the Energy Policy and Conservation Act of 1975 (the Act)[2] following the 1973–74 Arab Oil embargo. This program sets mandatory average fuel economy performance standards for passenger automobile manufacturers.[3] Because the standards establish required averages, a given manufacturer may produce some vehicles that fall short of the standard, as long as it also produces such others during the same year that the average does not fail to meet the required performance level.[4]

Noncompliance with the standards is unlawful[5] and is punished by civil penalties. Accordingly, a violating manufacturer can be liable for $50 for every mile per gallon that its average fuel economy is exceeded by the applicable standard, multiplied by the total number of passenger cars it made in the particular year.[6] The fine can be remitted if necessary to prevent insolvency, bankruptcy, or lessening of competition.[7]

The Act also permits exemptions from the fuel economy program for small manufacturers which produce less than 10,000 passenger cars annually, worldwide.[8] The Act authorizes the Administrator of NHTSA to grant an exemption only if the applicable standard "is more stringent than the maximum feasible average fuel economy level which such manufacturer can attain."[9] The Administrator must set alternative standards for the exempted manufacturer at the level of its own maximum feasible average fuel economy.[10] The assessment of this fuel economy level is to be governed by the same four factors designated for determining maximum feasible average fuel economy throughout the program:

(1) technological feasibility;

(2) economic practicability;

(3) the effect of other Federal motor vehicle standards on the fuel economy; and

(4) the need of the Nation to conserve energy.[11]

Applying these factors, the Administrator granted exemption applications submitted

---

1. Petitioners are the Center for Auto Safety and John Hubbard.

2. The Act amended Title V of the Motor Vehicle Information Savings Act, 15 U.S.C.A. § 2001 et seq. (1979).

3. 15 U.S.C.A. § 2002 (1979).

4. The relevant year is the "model year," which refers to the manufacturer's annual production period. § 501 of the Act, 15 U.S.C.A. § 2001 (1979).

5. 15 U.S.C.A. § 2007 (1979).

6. 15 U.S.C.A. § 2008(b)(1)(A) (1979).

7. 15 U.S.C.A. § 2008(b)(3). Certification by the Federal Trade Commission is necessary if lessening of competition is cause for remitting the fine. 15 U.S.C.A. § 2008(b)(3)(C) (1979).

8. 15 U.S.C.A. § 2002(c) (1979).

9. Id.

10. Id.

11. 15 U.S.C.A. § 2002(e) (1979).

by Rolls-Royce Motors, Inc., Excalibur Automobile Corp., and Maserati. In each instance, the agency published notice of the exemption application,[12] solicited and received public comment,[13] published a proposed decision,[14] and responded to comments in the publication of the final decision.[15]

## II.

Each of petitioners' arguments focuses on the apparent anomaly that luxury car manufacturers—and owners—are exempted from the burden of fuel conservation while others are not. Our scope of review is limited; we cannot grant the petition for review unless we find the Administrator's actions to be "arbitrary, capricious, or not otherwise in accordance with the law." [16] The luxury car manufacturers here fall within the exemption provision, and we find no legal violation in the Administrator's analysis permitting the exemptions.

Petitioners' chief argument is that the agency misapplied the statutory criterion of "economic practicability" in granting the exemptions.[17] Petitioners urge that this term should include the manufacturer's ability to absorb civil fines for non-compliance. Petitioners reason that the fines were conceived as economic disincentives to wasteful fuel use. We cannot find the Administrator's rejection of this reasoning to be in violation of the Act however seemingly unwise her ultimate decisions. NHTSA defined "economic practicability" for the purposes of exemptions as the financial capability of low volume manufacturers to improve the fuel economy of their vehicles through technological changes within available time. This definition does not stray from the common sense meaning of "economic practicability" nor from its import in the context of the Act.[18]

Petitioners also argue that the Administrator abused her discretion in setting alternate fuel levels for the exempted manufacturers without independently assessing feasible improvements.[19] The Administrator reviewed the design changes proposed by each manufacturer to achieve improved fuel economy. Again, the Administrator's course does not so deviate from the Act's requirements to warrant rejection by this court.

---

**12.** 42 Fed.Reg. 64171 (Dec. 22, 1977) (notice of Rolls-Royce Motors, Inc. petition for exemption), *reprinted in* Joint Appendix (J.A.) at 1; 43 Fed.Reg. 19311 (May 4, 1978) (notice of Excaliber Automobile Corp. petition for exemption), *reprinted in* J.A. at 4; 43 Fed.Reg. 46106 (Oct. 5, 1978) (notice of Maserati petition for exemption), *reprinted in* J.A. at 7.

**13.** Petitioner Center for auto Safety submitted comments on the proposed decisions to exempt Rolls-Royce Motors, Inc. and Excaliber Automobile Corp. Respondent's Appendix (R.App.) at 347, 349.

**14.** 43 Fed.Reg. 3081 (July 13, 1978) (proposed exemption of Rölls-Royce Motors, Inc.), *reprinted in* R.App. at 341; 43 Fed.Reg. 33268 (July 31, 1978) (proposed exemption of Excaliber Automobile Corp.), *reprinted in* R.App. at 344; 44 Fed.Reg. 3737 (Jan. 18, 1979), *reprinted in* R.App. at 351.

**15.** 44 Fed.Reg. 3710 (Jan. 18, 1979) (Final decision, Rolls-Royce Motors, Inc.), J.A. at 56; 44 Fed.Reg. 3708 (Jan. 18, 1979) (Final decision, Excaliber Automobile Corp.); 44 Fed.Reg. 11548 (March 1, 1979) (Final decision, Maserati), J.A. at 61.

**16.** 5 U.S.C. § 706 (1976).

**17.** Petitioners' Br. at 30–33. Petitioner Center for Auto Safety put forward the same argument in timely comments to NHTSA. *See* n.13 *supra.*

**18.** Petitioners argue that the definition used by NHTSA is identical to the meaning Congress gave to "economic feasibility" in the consumer products section of the Act. As different sanctions apply for non-compliance with that section than in the automotive fuel economy program, petitioners claim that the two economic terms cannot have similar meanings. We find more persuasive the argument offered by Maserati, the intervenor, which suggests that petitioners' proposed definition of economic practicability duplicates another provision applicable to auto manufacturers. Maserati notes that petitioners would restrict the low-volume manufacturer exemption to those companies which cannot bear the cost of fines or shift it to consumers. This view transforms the "economic practicability" factor into a "lessening of competition" consideration, included in the statute as a condition for remitting civil penalties. *See* 15 U.S.C.A. § 2008(b)(4) (1979).

**19.** Petitioners' Br. at 39–40.

Finally, and most essentially, petitioners claim that the exemption provision was never intended to apply to luxury car manufacturers.[20] It is true that Congress never expressly exempted expensive, luxury car manufacturers from fuel conservation obligations. Nonetheless, Congress left the door open for this result. Its exemption provision extends to any low-volume manufacturer, regardless of the kind of vehicle produced, as long as inability to comply is adequately shown. The policy concerns that support petitioners' view rapidly fade in light of the Act's overall approach which evaluates a manufacturer's *average* fuel consumption for all its models. This approach clearly permits major manufacturers to produce luxury cars, because they can offset their inordinate energy consumption with other lines of highly efficient models.[21] Apparently, Congress created the exemption to alleviate the burdens placed on *any* small manufacturer who lacks diversified model lines for averaging fuel use.[22] Thus, however unwise one may find exemptions of luxury cars, they are not precluded by the exemption provision. Since the energy conservation purpose which generated the 1975 Act is so much more compelling in 1980, a reexamination of the exemption provision by the Congress, if not by the agency, would seem highly appropriate.

*Petition denied.*

J. SKELLY WRIGHT, Chief Judge, concurring:

By exempting these foreign manufacturers of luxury cars which burn inordinate amounts of gasoline (Rolls-Royce, Excalibur, and Maserati) from its gasoline conservation regulations, NHTSA makes a mockery of our professed attempts to reduce gasoline consumption. These exemptions not only promote waste of gasoline; they increase our air pollution as well as our foreign trade deficit. In light of these results, the Congress may want to reconsider this matter and determine whether these are the goals that it had in mind at the time it created the statutory scheme.

---

**20.** *Id.* at 33–39.

**21.** *See* 15 U.S.C.A. § 2003(a)(1) (1979).

**22.** The Senate initially passed a bill permitting exemptions only for low-volume manufacturers whose "automobiles are sold predominantly for commercial use." S. 1883 § 102, *cited in* S.Rep. No. 94–179, 94th Cong., 1st Sess. 39 (1975). But the bill receiving final approval by both houses had no such limitation on its exemption provision. If this legislative history points in any direction, it is that Congress was unwilling to limit the exemption option beyond constricting it to needy low-volume manufacturers.