**In re CENTER FOR AUTO SAFETY, et al., Petitioners.**

**No. 85–1348.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1986.

Decided June 20, 1986.

Scalia, Circuit Judge, filed dissenting opinion.

Cornish F. Hitchcock, with whom Alan B. Morrison and Clarence M. Ditlow, III, Washington, D.C., were on brief, for petitioners. Katherine I. Hall, Washington, D.C., also entered an appearance, for petitioners.

Marleigh D. Dover, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, David W. Allen and Stephen P. Wood, Asst. Chief Counsels, Enid Rubenstein and J. Edward Glancy, Attys., Nat. Highway Traffic Safety Admin. and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on brief, for respondents. William Kanter and Irene M. Solet, Attys., Dept. of Justice, Washington, D.C., were also on brief, for respondents.

Before EDWARDS, SCALIA and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge SCALIA.

HARRY T. EDWARDS, Circuit Judge:

The National Highway Traffic Safety Administration ("NHTSA") is required by the Energy Policy and Conservation Act ("EPCA") to promulgate fuel economy standards for light trucks 18 months before the start of each model year.[1] In June 1985, after the agency repeatedly missed this deadline, the petitioners[2] requested this court to enter a writ of mandamus compelling NHTSA to immediately promulgate the 1987 model year standards and to comply with the statutory deadlines for future standards. In September 1985, six months after the deadline and while the petition was pending in this court, NHTSA

---

**1.** 15 U.S.C. § 2002(b) (1982).

**2.** The petitioners are the Center for Auto Safety, the Environmental Policy Institute, Public Citizen and Union of Concerned Scientists. For convenience, reference will be limited to the Center for Auto Safety.

promulgated the 1987 model year standards. At the time of oral argument in March 1986, the agency was faced with yet another deadline for the 1988 model year standards; after receiving a request for timetables from this court, NHTSA finally issued the 1988 model year standards in April 1986.

The Government's threshold contention that the petitioners lack standing to request this court to compel agency action is clearly without merit. As in the related case of *Center for Auto Safety v. NHTSA*,[3] the petitioners have suffered an injury-in-fact and meet the Article III requirements for standing. The prudential inquiry into whether petitioners present a "generalized grievance" is not germane to either case because Congress granted generous standing to seek judicial review of fuel economy standards when it enacted EPCA.

In addition, there is no merit to the contention that this case is moot. The petitioners have challenged a *pattern* of delay by the agency. While NHTSA has issued the standards specifically requested by the petitioners, and "expects" to issue the next set of fuel economy standards on time, nothing has happened to ensure that the pattern of delay has abated. In any event, the agency's "voluntary cessation" of allegedly illegal conduct does not moot the entire case. The agency has failed to carry its burden of showing that there is no reasonable expectation that it will once again miss the statutory deadline in the upcoming rulemaking.

Finally, on the merits, the evidence indicates that NHTSA has repeatedly delayed issuing the light truck fuel economy standards in total disregard of the obligations imposed on it by Congress. As a result of these delays, the agency has set standards at fuel economy levels lower than those it projected the manufacturers could achieve,

justifying its action in part by reasoning that the industry lacked time to respond to stricter requirements. In this way, the agency itself impedes progress toward the statutorily mandated goals of fuel conservation and national energy self-sufficiency. These persistent delays and the obvious adverse consequences that they produce do not bode well for the regulatory scheme under EPCA. In order to ensure future compliance with the statute, this court has no reasonable choice but to retain jurisdiction until NHTSA promulgates the 1989 model year standards.

## I. BACKGROUND

The regulatory framework established by EPCA for the purpose of improving motor vehicle fuel efficiency has been described in detail in a companion case, *Center for Auto Safety*.[4] The centerpiece of this regulatory scheme is the program of mandatory Corporate Average Fuel Economy ("CAFE") standards, set at the "maximum feasible average fuel economy level"[5] in miles per gallon ("mpg"). Each manufacturer's fleet must achieve this fuel efficiency, on average, every model year.

EPCA requires the Secretary of Transportation, who has in turn delegated this responsibility to NHTSA,[6] to prescribe standards for light trucks "at least 18 months prior to the beginning of such model year."[7] Once issued, the fuel economy standards may be amended, but any amendment "which has the effect of making any average fuel economy standard more stringent shall be" promulgated "at least 18 months prior to the beginning of the model year to which such amendment will apply."[8]

Although the statute is silent on the required timing of amendments relaxing the standards, the Conference Report on EPCA

---

**3.** 793 F.2d 1322 (D.C.Cir.1986).

**4.** *See id.,* at 1324–1326.

**5.** 15 U.S.C. § 2002(b) (1982).

**6.** *See* 49 C.F.R. § 1.50(f) (1985).

**7.** 15 U.S.C. § 2002(b) (1982).

**8.** *Id.* § 2002(f)(2).

states that "[a]n amendment which has the effect of making an average fuel economy standard less stringent can be promulgated at any time prior to the beginning of the model year in question." [9] The agency has adopted this interpretation of the statute.[10]

NHTSA has never established one particular date as the official start of a model year. While selected models may be available as early as the July preceding the calendar year, or as late as December,[11] the model year is traditionally thought to start approximately October 1st. Agency practice through 1980 reinforces this conclusion, as no CAFE standards were ever prescribed later than March for the model year starting one and one-half years later. In the context of strengthening amendments, which like the standards require an 18-month leadtime, this court has stated:

> Thus, amendments to standards for the 1985 model year—which we presume absent contrary evidence to begin during the autumn of 1984—must be promulgated by early 1983.[12]

Between 1977 and 1980, NHTSA issued light truck CAFE standards for the model years 1979 through 1985 in a timely fashion.[13] In November 1983, Ford Motor Company ("Ford") requested the agency to amend the 1984 and 1985 standards to make them more lenient. NHTSA denied Ford's request for 1984 because the model year was already underway.[14] However, on October 16, 1984, the agency amended the 1985 model year standards,[15] notwithstanding the fact that the new trucks and vans were already in the showrooms. Thus, in practical terms, the 1985 model year had already commenced. In the same notice, NHTSA prescribed standards for model year 1986, which had been due the previous March, and declined to issue 1987 standards.[16]

In June 1985, with the 1987 standards still unpromulgated, the Center for Auto Safety filed a petition challenging the agency's delay and requesting "entry of a writ compelling immediate promulgation of the 1987 light truck fuel economy standard and compelling NHTSA's compliance with the deadlines of the Act for future model years." [17]

In July 1985, NHTSA's Associate Administrator for Rulemaking, Barry Felrice, stated in an affidavit that he expected the agency to promulgate the 1987 standards no later than mid-September. He also anticipated issuing a Notice of Proposed Rulemaking ("NPRM") on the 1988 standards during October or November, in order to

9. S.Rep. No. 516, 94th Cong., 1st Sess. 157 (1975), U.S.Code Cong. & Admin.News 1975, p. 1998.

10. *See* 49 Fed.Reg. 41,250, 41,255 (1984) ("The agency believes that Congress intended standards to be established before production begins, to encourage the achievement of particular fuel economy levels rather than simply ratifying past conduct.").

11. *See* 45 Fed.Reg. 20,871, 20,877 (1980).

12. *Center for Auto Safety v. NHTSA,* 710 F.2d 842, 847 (D.C.Cir.1983).

13. *See* 42 Fed.Reg. 13,807 (1977) (1979 model year, issued Mar. 8, 1977); 43 Fed.Reg. 11,995 (1978) (1980–1981 model years, issued Mar. 15, 1978); 45 Fed.Reg. 20,871 (1980) (1982 model year, issued Mar. 27, 1980); 45 Fed.Reg. 81,593 (1980) (1983–1985 model years, issued Dec. 8, 1980).

14. 49 Fed.Reg. 41,250, 41,254–55 (1984).

15. 49 Fed.Reg. 41,250 (1984).

16. Model year 1986 standards were not even *proposed* until the month they were due, March 1984, when NHTSA issued a Notice of Proposed Rulemaking for the 1986–1987 model years. 49 Fed.Reg. 8637 (1984). With regard to the 1987 standards, the agency defended its decision to delay promulgating them as follows:

> A decision has not been reached with respect to the proposed 1987 model year standards.... There is a considerable period of time before the agency is required to issue model year 1987 standards. The agency needs additional time to complete its analysis of issues relating to such standards. Some of those issues, particularly those relating to market trends, are characterized by uncertainty and complexity.

49 Fed.Reg. 41,250, 41,251 (1984).

17. Petition for a Writ to Compel Agency Action Unreasonably Delayed, *reprinted in* Joint Appendix ("J.A.") 135, 136.

permit the final 1988 rule to issue by March 1986.[18] Felrice's projections proved too optimistic. NHTSA issued the final 1987 standards on September 30, 1985,[19] and did not issue a NPRM for the 1988 and 1989 model years until January 21, 1986.[20] When argument in this case was heard on March 14, 1986, the 1988 and 1989 standards had not yet been promulgated, and counsel for NHTSA stated, "I cannot give you specific dates when [they] will be out."[21] Subsequently, the court requested the agency to file, by April 18, 1986, a supplemental memorandum setting forth the dates by which the agency expected to issue light truck CAFE standards for model years 1988 and 1989.[22] The agency then issued the 1988 standards on April 17, 1986,[23] and Barry Felrice indicated in an affidavit that he expects the rule for model year 1989 to issue by February 28, 1987.[24]

## II. STANDING

The Government raises objections to petitioners' standing identical to those they advanced in *Center for Auto Safety;* these objections fare no better here than in the companion case.

■ The petitioners seek standing as representatives of their members, who desire to purchase light trucks of the highest possible fuel efficiency. As already shown in *Center for Auto Safety,* lower CAFE standards injure this interest. In the present case, injury is caused not only by lower standards, but also by the industry's impaired ability to comply with CAFE stan-

dards that are imposed with inadequate leadtimes.

Both the agency and the industry have repeatedly stressed the importance of adequate leadtime for the industry to develop and incorporate the technology necessary to improve fuel efficiency. NHTSA has frequently cited inadequate time as a factor justifying its failure to impose a higher standard, even in rulemakings that complied with the statutory schedule. For example, in 1978, NHTSA concluded that

the limited leadtime available before the 1980 model year and slightly limited leadtime before [the] 1981 model year have *significantly restricted the extent to which the agency can project fuel economy improvements for the manufacturers.* For example, no completely new vehicles or engines were projected by NHTSA unless those items were already planned by manufacturers.[25]

Lack of an adequate leadtime obviously becomes *even more* crucial when the agency fails to meet the statutory deadline for issuance of the standard. First, these delays reduce the ability of a manufacturer to adjust its course and thus frustrate attempts to comply with the standard.[26] Second, because manufacturers cannot respond rapidly to last minute standards, the agency must set tardy standards leniently. In setting the 1986 model year standards, which the agency issued six months late, NHTSA *explicitly acknowledged* that the insufficient leadtime was one reason it set the combined standard at a level *below* that

---

18. Affidavit of Barry Felrice (July 30, 1985) at 7, 8, Brief for the Respondents, Appendix ("App.").

19. 50 Fed.Reg. 40,398 (1985).

20. 51 Fed.Reg. 3221 (1986).

21. Transcript at 18.

22. *In re Center for Auto Safety,* No. 85–1348, order (D.C.Cir. Mar. 25, 1986).

23. 51 Fed.Reg. 15,335 (1986).

24. Affidavit of Barry Felrice (Apr. 18, 1986), Respondents' Supplemental Memorandum.

25. 43 Fed.Reg. 11,995, 12,012 (1978) (emphasis added); *see also* 42 Fed.Reg. 13,807, 13,808 (1979 model year).

26. For example, in urging prompt agency action on its request for an amendment to lower standards for the 1984–1985 model years, Ford explained that it would establish final sales projections in March 1984 for the 1985 model year, and would begin to order production parts for engines in June. Ford described those decisions as "irrevocable" or at least as "very costly and difficult to reverse." Letter from Donald R. Buist to Diane K. Steed (Jan. 20, 1984), *reprinted in* J.A. 37.

which it projected *all* manufacturers would be able to achieve.[27]

It is apparent that when NHTSA fails to meet the statutory deadline it cannot reasonably expect to set CAFE standards that provide a meaningful challenge to the industry. Even worse, as time goes by, it cannot even hope to have an effect on manufacturers' plans for the model year. This impotence creates injury because the resulting lower standards obviously reduce the variety of fuel-efficient vehicles and the range of options available. Moreover, because credits earned for exceeding the CAFE standard can be used to cancel penalties for failure to comply in future years,[28] lower standards also reduce fuel efficiency into the future by removing incentives to develop new technology. More generally, the drop in the average fuel economy of the fleet results in more gasoline consumption than would otherwise be the case.

As noted in *Center for Auto Safety*, these injuries meet the standing requirements imposed by Article III. Because standing to petition for review of CAFE standards under EPCA extends to the full limits permitted by Article III,[29] we need not pursue an inquiry into the prudential requirements for standing.[30] Moreover, to deny standing here because there are a large number of people who share petitioners' injuries would be totally inconsistent with this court's numerous recognitions of standing in lawsuits brought by consumer groups [31] and with the course this court has taken in previous challenges to CAFE standards.[32]

### III. MOOTNESS

Since the Center for Auto Safety filed its petition for a writ of mandamus in June 1985, NHTSA has prescribed final light truck CAFE standards for model year 1987 [33] and model year 1988,[34] and issued a

---

27. The agency, which has in recent years established the standards at the level the "least capable" manufacturer was projected to achieve, described its projections of the maximum fuel economy each manufacturer could achieve in the 1986 model year (Ford: 20.4 mpg; General Motors: 20.6 mpg; Chrysler Corporation: 21.5 mpg). It then stated:

> There are additional factors to be considered selecting [sic] the 1986 standards. Major technological changes cannot be made in manufacturers' product plans for that year. New programs cannot be developed to compensate for market shifts or technological problems.... For all the above reasons, the agency has decided to set the 1986 composite standard at 20.0 mpg.

49 Fed.Reg. 41,250, 41,253 (1984).

28. *See* 15 U.S.C. § 2002(*l*) (1982).

29. EPCA specifies that *"[a]ny person who may be adversely affected by any rule* [concerning fuel economy standards]" may file a petition for review in this court. 15 U.S.C. § 2004(a) (1982) (emphasis added).

30. *See, e.g., Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

31. *See, e.g., Consumers Union v. FTC,* 691 F.2d 575, 576–77 (D.C.Cir.1982) (en banc) (car purchasers deprived of disclosures), *aff'd,* 463 U.S. 1216, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983); *Public Citizen v. Foreman,* 631 F.2d 969, 974 n. 12

(D.C.Cir.1980) (bacon purchasers subjected to nitrate additions); *Federation of Homemakers v. Butz,* 466 F.2d 462 (D.C.Cir.1972) (consumers challenging adequacy of meat labeling); *Environmental Defense Fund v. Hardin,* 428 F.2d 1093, 1096–97 (D.C.Cir.1970) (unwilling consumers of pesticide residues). *See also Community Nutrition Institute v. Block,* 698 F.2d 1239, 1251:

> [W]e refuse to believe that the mere fact that a plaintiff's injury is shared by many people requires a court to dismiss his complaint. If dismissal were required in such cases, consumer injuries would never be justiciable because "[c]onsumer injuries, by their very nature tend to be shared in common by many other similarly situated individuals."

(quoting *Cutler v. Kennedy,* 475 F.Supp. 838, 848 n. 23 (D.D.C.1979)), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

32. *See, e.g., Center for Auto Safety v. NHTSA,* 710 F.2d 842 (D.C.Cir.1983); *Center for Auto Safety v. Claybrook,* 627 F.2d 346 (D.C.Cir.1980); *see also Natural Resources Defense Council, Inc. v. Herrington,* 768 F.2d 1355 (D.C.Cir.1985) (challenge to energy standards for appliances brought under a separate section of EPCA, which grants standing to "[a]ny person who will be adversely affected by a rule" to challenge agency rulemaking, 42 U.S.C. § 6306(b) (1982)).

33. 50 Fed.Reg. 40,398 (1985).

34. 51 Fed.Reg. 15,335 (1986).

NPRM for model year 1989.[35] NHTSA argues that there is therefore no longer any specific relief which this court can order, and urges us to dismiss the case as moot. The petitioners' requests that we compel the agency to issue standards for the particular model years of 1987 and 1988 are now moot. However, the petitioners also objected to NHTSA's chronic delays and requested this court to compel timely issuance of the standards for *future* model years.

Recently, NHTSA has followed a pattern of delay in violation of the unambiguous statutory command that the agency issue standards 18 months in advance of the model year. The agency prescribed the 1986 model year standard at the end of October 1984, seven months late. The 1987 model year standard was issued at the end of September 1985, six months after the statutory deadline. Although faced with a pending request for mandamus, the agency did not even propose 1988 standards until the end of January 1986, only two months before EPCA required final promulgation of the standard. At oral argument, counsel for the agency was unable to even speculate when the 1988 standards would be issued. It was only in response to this court's request for a timetable that NHTSA issued the standards, already one month late. In addition, the agency failed to amend the 1985 standards before the start of that model year. In short, *none* of the light truck CAFE standards issued since 1980 have been timely, even when agency action was subject to judicial scrutiny.

■ Under these circumstances, it cannot reasonably be claimed that the case has been completely mooted by NHTSA's issuance of the 1987 and 1988 model year standards. The agency's pattern of missing deadlines remains, even though petitioners' requests for relief for specific model years are moot.[36] Indeed, even if the agency has turned over a new leaf, courts have long recognized that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of that practice."[37] Otherwise, "the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'"[38] Thus, when the respondent has voluntarily ceased the challenged activity, a case is not moot unless there is a showing "that there is no reasonable expectation that the alleged violation will recur and that interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."[39] The burden of this demonstration is a heavy one, and falls on the respondent;[40] the burden clearly has not been met in this case.

■ The only assurance we have that the agency has permanently ceased its pattern of tardy fuel economy standards is the bald assertion that "NHTSA expects to issue the model year 1989 light truck fuel economy standards no later than February 28, 1987."[41] However, during the course of this litigation the agency has repeatedly failed to meet the dates it projected.[42] The agency offers manpower shortages and last minute revisions of industry data as

**35.** 51 Fed.Reg. 3221 (1986).

**36.** *See Better Government Ass'n v. Department of State,* 780 F.2d 86, 91 n. 20 (D.C.Cir.1985).

**37.** *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982).

**38.** *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).

**39.** *Conyers v. Reagan,* 765 F.2d 1124, 1128 n. 9 (D.C.Cir.1985); *see also County of Los Angeles v.*

*Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

**40.** *See Doe v. Harris,* 696 F.2d 109, 112 (D.C.Cir. 1982); *accord Mississippi River Transmission Corp. v. FERC,* 759 F.2d 945, 952 n. 9 (D.C.Cir. 1985); *Monzillo v. Biller,* 735 F.2d 1456, 1460 (D.C.Cir.1984).

**41.** Affidavit of Barry Felrice (Apr. 18, 1986) at 2, Respondents' Supplemental Memorandum.

**42.** *See* text at notes 16–21 *supra.*

explanations for its delay on the 1987 standards, and gives no reason to suggest that these same difficulties will not recur.[43] In fact, there is evidence that NHTSA has abolished the administrative unit formerly responsible for developing fuel economy standards and greatly reduced the number of people available to perform this duty.[44] In addition, the agency has weakened its requirements for data submission and no longer regularly requires certain types of information heretofore seen to be needed to promulgate standards in a more timely fashion.[45]

It is also noteworthy that NHTSA disputes the petitioners' contention that it has established a pattern of delay and has issued light truck CAFE standards in an untimely fashion for the last four model years. The agency does acknowledge that the 1986 and 1987 model year standards failed to meet EPCA's deadline, but it attempts to justify its delay as reasonable.[46] This refusal to admit the illegality of its past conduct heightens the probability that the agency will once again fail to meet statutory deadlines in the future.

> [W]hen a complaint identifies official conduct as wrongful and the legality of that conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition.... [47]

In light of the record in this case, it must be found that there is "some cognizable danger of recurrent violation."[48] There-fore, the conclusion is inescapable that the merits of petitioners' claims cannot be avoided on grounds of mootness.

## IV. MERITS

The Administrative Procedure Act sets a requirement for agencies to conclude business "within a reasonable time,"[49] and the courts are instructed to "compel agency action unlawfully withheld or unreasonably delayed."[50] In addition to these general strictures, EPCA designates a specific deadline for agency issuance of CAFE standards. Hence, NHTSA's failure to meet the statutory requirement is "not in accordance with law."[51]

In *Telecommunications Research & Action Center v. FCC ("TRAC")*,[52] we stated that a "rule of reason" determines the amount of time an agency may take to reach a decision and that when Congress sets a timetable, the statutory scheme provides a content for this rule.[53] In its enactment of EPCA, Congress created a specific deadline in order to provide the industry with a leadtime of 18 months. This leadtime is important, as discussed above, to allow the agency to set CAFE standards at the level that is truly the "maximum feasible" fuel economy. In other words, when NHTSA persistently fails to observe the EPCA deadline, it eviscerates the very purpose of the regulation.

The pattern of delay that NHTSA has exhibited in recent years is also detrimental

---

**43.** This total lack of *any* indication that the agency has taken steps to ensure timely issuance of standards as a routine matter differentiates the present case from *Edgewood Management Corp. v. United States,* 762 F.2d 137 (D.C.Cir. 1985) (dismissing case as moot), which the respondents rely on as most similar to their situation. In *Edgewood,* companies that manage rental properties sought a writ of mandamus against the U.S. Marshal to rectify delays in serving writs of restitution. While the action was pending, the Marshal instituted new procedures and added personnel to execute this duty. NHTSA has described no such efforts on its part to deal with its delays.

**44.** *See* Affidavit of Joan B. Claybrook (Sept. 3, 1985) at 2, Reply Brief for Petitioners, App.

**45.** *See* 47 Fed.Reg. 34,985 (1982).

**46.** *See* Brief for the Respondents at 18.

**47.** *Doe v. Harris,* 696 F.2d 109, 113 (D.C.Cir. 1982).

**48.** *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953).

**49.** 5 U.S.C. § 555(b) (1982).

**50.** *Id.* § 706(1) (1982). *See Costle v. Pacific Legal Found.,* 445 U.S. 198, 220 n. 14, 100 S.Ct. 1095, 1108 n. 14, 63 L.Ed.2d 329 (1980).

**51.** 5 U.S.C. § 706(2) (1982).

**52.** 750 F.2d 70 (D.C.Cir.1984).

**53.** *Id.* at 80.

to industry compliance with the standards. The agency itself has stressed that, unlike the passenger automobile fuel economy standards, which are fixed indefinitely at 27.5 mpg unless NHTSA amends them, *no* light truck CAFE standards are in place until established by the agency.[54] Thus, manufacturers cannot plan ahead and ensure compliance with the standard until it is issued.

In addition, although short in terms of an absolute time period, NHTSA's delays have been long relative to the leadtime available prior to the start of the model year.[55] As the model year approaches, the agency loses the capacity to do anything more than rubberstamp the fuel economy levels projected by the manufacturers unless it wishes to risk economic dislocation. When the agency's role descends to this level, not only is NHTSA's credibility impaired, but EPCA's system of mandatory standards becomes meaningless.

Given the foregoing facts, there is no doubt that the agency's delays in issuing the standards have been unreasonable. However, because the agency has prescribed the 1987 and 1988 model year standards, and has made some progress toward the 1989 standards in the form of a NPRM, there is reason for the court to stay its hand for the time being. But, because of NHTSA's history of chronic delay and its repeated failure to meet its own projections, even in the face of a pending lawsuit and while subject to court scrutiny, the least that this court must do is to retain jurisdiction over this case until agency publication of the final model year 1989 light truck CAFE standards.[56] In this way we can ensure future compliance with the stat-

ute without having to speculate over the possibility of further agency delays.

*So ordered.*

SCALIA, Circuit Judge, dissenting:

I dissent for the reasons set forth in my dissent in the companion case decided simultaneously with this, *Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322.

---

**54.** 51 Fed.Reg. 15,335, 15,344 (1986).

**55.** While this court has, on occasion, refused to find longer delays unreasonable, *see, e.g., In re United Steelworkers of America*, 783 F.2d 1117 (D.C.Cir.1986); *Oil, Chemical and Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480 (D.C.Cir. 1985), they have been unconnected to a statutory deadline. Rather than single, unitary rulemakings undertaken as a matter of agency discretion, we deal here with statutorily mandated annual rulemakings beset with repeated delay.

**56.** *See, e.g., International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Donovan*, 756 F.2d 162 (D.C.Cir.1985); *Air Line Pilots Ass'n v. CAB*, 750 F.2d 81 (D.C.Cir. 1984).

Pending final agency action on the 1989 standards, the parties will of course retain the right to petition this court to take additional appropriate action as may be warranted. *See TRAC v. FCC*, 750 F.2d 70, 81 (D.C.Cir.1984).